UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

UNITED STATES OF AMERICA,                          )

                           Plaintiff,       )

                 -against-                        )       S2 04 Cr. 045 (HB)

JUAN CARLOS ELLIS; and,                             )
GERARDO PALMA
                                 )

                 Defendants.

-----------------------------------------------------------------x

## **PRESENTENCE MEMORANDUM OF JUAN CARLOS ELLIS AND GERARDO PALMA**

RONALD L. KUBY [RK-1879]
DAVID PRESSMAN [DP-9136]

Law Office of Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, New York 10011
(212) 529-0223 (t)
(212) 529-0644 (f)

Attorneys for Mr. Palma and Mr. Ellis

Dated:  New York, New York
        August 4, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA,                    )

                          Plaintiff,         )

              -against-                      )        S2 04 Cr. 045 (HB)

JUAN CARLOS ELLIS; and,                      )
GERARDO PALMA
                                             )

                          Defendants.
-------------------------------------------------------------x

### PRESENTENCE MEMORANDUM OF JUAN CARLOS ELLIS AND GERARDO PALMA

Two men, both Canadian, both fathers and husbands, both lacking any criminal history

and any direct contact with the United States, stand before this Court for sentence as defendants

in a multiple-defendant, multiple-continent case that is remarkable and bewildering in its

complexity.

This Court is very familiar with the allegations underlying the so-called "Colombian

black market peso exchange" that forms the basis of the charges against Mr. Ellis and Mr. Palma.

The United States Attorney's Office identified a large swath of so-called "peso brokers"

involved in a multi-tiered money laundering conspiracy. The Prosecution categorized

individuals involved in three-tiers, demarcating their involvement and role in the conspiracy.

Generally, first-tier peso brokers had direct contact with the narcotics traffickers in Colombia,

while second- and third-tier peso brokers lacked these direct contacts.

Gerardo Palma and Juan Carlos Ellis were neither first- nor second- nor third- tier peso

brokers. Mr. Palma and Mr. Ellis transported cash in Canada to undercover law enforcement

officers. They were mules at the bottom of a very sophisticated, international criminal conspiracy that involved the United States of America.

Pursuant to a plea agreement, Mr. Ellis and Mr. Palma agreed that the applicable Sentencing Guidelines offense level is 20 and that their Criminal History Category is appropriately classified as I (neither have any criminal record whatsoever). Accordingly, the suggested Guidelines sentencing range is 33 to 41 months of imprisonment. Pursuant to their plea agreement, Mr. Palma and Mr. Ellis do not challenge this calculation under the Guidelines. However, all parties have agreed that Defendants may seek a sentence below the Guidelines range pursuant to the factors enumerated in 18 U.S.C. § 3553(a). The Presentence Investigation Reports for both Mr. Ellis and Mr. Palma track the plea agreement, and the Probation Office recommends this Court impose the minimum Guidelines sentence (33 months) for both defendants.

By the time of sentencing, Mr. Palma and Mr. Ellis will have been in custody for over 9 months.[1] As this Court is well aware, "[a] trilogy of Supreme Court cases over the past several years has made it 'pellucidly' clear that while judges must pay homage to the Guidelines, the Guidelines are only advisory." United States v. Collado, 2008 WL 2329275, at * 3 (S.D.N.Y.

---

[1] **Juan Carlos Ellis** was taken into custody in Canada on May 3, 2004 and released on bail on June 4, 2004 (33 days). He was again taken into custody on December 5, 2005 after the court of first impression delivered its decision on extradition, and released on bail on December 7, 2005 pending appeal of that decision (3 days). Following appellate review of the extradition order, Mr. Ellis was again taken into custody on December 12, 2007 and transferred to the United States on January 22, 2008 (42 days), where he remains confined (199 days). Mr. Ellis' total confinement, measured from the date of scheduled sentencing, is therefore 277 days.

**Gerardo Palma** was taken into custody in Canada on May 3, 2004 and released on bail on June 1, 2004 (30 days). He was again taken into custody on December 5, 2005 after the court of first impression delivered its decision on extradition, and released on bail on December 7, 2005 pending appeal of that decision (3 days). Following appellate review of the extradition order, Mr. Palma was again taken into custody on December 12, 2007 and transferred to the United States on January 22, 2008 (42 days) and transferred to the United States where he remains confined (199 days). Mr. Palma's total confinement, measured from the date of scheduled sentencing, is therefore 274 days.

2008)(Baer, J.).  A sentencing court is to consider the individual defendants, the characteristics of their individual acts, and the goals of sentencing as set forth in 18 U.S.C. § 3553(a)(2).  Each of these factors argue strongly for an out-of-guidelines sentence for two men at the bottom of a very complex conspiracy.

Defendants respectfully seek a sentence of time served, followed by immediate deportation to Canada, where both Mr. Palma and Mr. Ellis may face further civil penalties.  See Exh.A (Ltr. from Revenu Quebec to Juan Carlos Ellis, dated Mar. 31, 2008).

## I. GERARDO PALMA AND JUAN CARLOS ELLIS: HARD-WORKING, LOW-INCOME, DEVOTED FATHERS WITH NO CRIMINAL RECORD—DEFENDANTS' "HISTORY AND CHARACTERISTICS" (18 U.S.C. § 3553(A)(1).

18 U.S.C. § 3553(a)(1) requires this Court to consider Mr. Ellis and Mr. Palma's "history and characteristics" when imposing sentence.  Id.  They deserve and justice demands a below Guidelines sentence.  Until becoming enwrapped in the current offense, Mr. Palma and Mr. Ellis have spent their entire adult lives as law-abiding citizens.  They participated in a scheme whose complexity and transnational criminality they were not, and could not have been, aware of.

### A. Gerardo Palma

Gerardo Palma was born in Montevideo, Uruguay.  His family, searching for a better life, moved to Montreal, Canada, where Mr. Palma has lived for the past 30 years, until his arrest and extradition.

Mr. Palma is thirty-seven years old.  He has not visited the United States since he was fifteen years old, when he and his father, now deceased, crossed the border to purchase an incomparable slice of New York pizza.  Mr. Palma's family is close.  He is the youngest of six siblings, each of whom also reside in Montreal.

Seven years ago, Mr. Palma married the love of his life, Nadia Landucci, with whom he has had two children, Enrique, age 5, and Adriana, age 4. Their family is close and caring. Nadia writes, "Gerardo is an extraordinary person, he is a very affectionate person, funny, sociable, friendly, helpful, and a hard worker, good hearted, gentle, loving…[he] does not smoke, does not drink, does not take any drugs…With me his wife he is the best husband and father. He is romantic, loyal, faithful, and always there for me. Gerardo with his children, it is incredible how he is a good father. He loves playing with them. He would give them their bath, feed them, and would put them to sleep with a bedtime story. He would wake up early to bring his son to school. He loves his kids more than life. He is a person that is not ashame[d] to say he loves you…" (Exh. B at 2).[2] Nadia remains an incredible mother to their children, bearing the burden of raising them in Mr. Palma's absence. Nadia's mother, Mr. Palma's mother-in-law, describes Gerardo as "a very caring person with a very big heart…He is a very loving person to his wife and two children. Gerardo loves to surround himself with family and friends. He works hard to make sure that his wife and children have everything they need." (Exh. B at 4). Mr. Palma's brother adds that his children regularly ask him "when their uncle is coming back because they miss him and cry…Gerardo's children, his family and his friends really miss him." (Exh. B at 9).

A devoted family-man, Mr. Palma has worked hard to provide for them. For years, he toiled as a cleaning man, and later joined the kitchen staff of a neighborhood restaurant. He has never used drugs and rarely drinks.

---

[2] Letters from individuals who know Defendants well have been provided for the Court's reference. Letters in support of Mr. Palma are attached as Exhibit B. Letters in support of Mr. Ellis are attached as Exhibit C. Where necessary, both the original letter and an English translation have been provided. In addition to the letters specifically cited in this Memorandum, additional letters of support for Mr. Palma can be found at Exh. B at 1 to 23, and for Mr. Ellis at Exh. C. at 1 to 4.

Four years ago, Mr. Palma made a series of mistakes and violated United States law. Unfortunately, he was part of an operation much larger than he could possibly imagine. While he was aware the money he was transporting were the proceeds from an illegal transaction, he did not know, and could not imagine, that he was committing a crime in the United States. Nor did he know that the ultimate source of the funds were narcotics proceeds.

With no criminal record, no connection to the United States, and limited culpability, Mr. Palma deserves an out-of-guidelines sentence of time served, followed by immediate deportation to Canada where he may face additional civil penalties.

### B.  Juan Carlos Ellis

Juan Carlos Ellis and his twin brother, Patricio, were born in Santiago, Chile in 1961 and emigrated to Canada in 1976, when Juan Carlos was 14 years old. On August 8, 1987, Mr. Ellis married Louisa Timperio, who he met and fell in love with several years earlier. Together they had a daughter, Paulina Ellis, who is now 18 years old and resides in Quebec. In his entire life, Mr. Ellis has visited the United States on only four occasions, the last of which was 5-6 years ago when he took his daughter to Disneyland. He has spent his entire life as a law-abiding citizen and has no criminal record whatsoever.

Mr. Ellis' daughter, Paulina, writes "He [has] always be[en] there for me day and night to take care of me, talk to me, listen to me, teach me good things...I know that family is the most important part of his life." Exh. C at 1. "I am proud of my father, because he... [taught] me that life is not always easy, that we have to love, to support, to help, to forgive, to share," Pauline wrote. Mr. Ellis' twin brother, Patricio, describes his brothers' strong and loving support during his Patricio's struggle with cancer. Exh. C at 2.

Mr. Ellis' life has been characterized by hard work.  To support his family, Mr. Ellis had to leave school after the sixth grade to work as an office janitor, later being promoted to a building maintenance supervisor.

Mr. Ellis does not drink (except occasionally enjoying a glass of wine with dinner) and has never used drugs.  He has worked hard to provide for his family and in his absence, his wife and daughter are struggling to meet their financial needs.  "Taking care of his family is what was important to Carlos.  He is someone that is very hard working, positive and has a love for life…Carlos is fundamentally a good person and an excellent brother…he is my family," Mr. Ellis' twin brother, Patricio, wrote.  Exh. C at 2.

Mr. Ellis and Mr. Palma are hard-working, law-abiding, family-men.  They have worked as janitors and cooks to provide for their families.  They were looking to make a quick dollar and agreed to transport cash from one person in Canada to another person in Canada.  They did not agree to conspire with dozens of individuals across multiple continents in a wholesale attempt to evade the laws of the United States.  The "history and characteristics" of Mr. Ellis and Mr. Palma warrant an out-of-guidelines sentence.  18 U.S.C. § 3553(a)(1).

## II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE (18 U.S.C. § 3553(A)(1))

In addition to considering "the history and characteristics of the defendant[s,]" this Court must consider "the nature and circumstances of the offense[.]"  18 U.S.C. § 3553(a)(1).  In this multi-defendant case, spanning multiple continents, the Sentencing Guidelines do not adequately reflect the culpability of Mr. Ellis or Mr. Palma's role.  An out-of-guidelines sentence of time served is appropriate.

**A. Neither Mr. Palma Nor Mr. Ellis Had Any Contact With The United States Or Any Knowledge That Their Conduct Affected, Or Constituted A Crime In, The United States.**

Mr. Palma has not traveled to the United States since he was a fifteen year-old boy accompanying his father across the border for a slice of New York pizza. Mr. Ellis has been to the United States only a few times, primarily to take his daughter to Disneyland. Neither had knowledge that their conduct in any way involved the United States, violated United States law, or would subject them to criminal prosecution in the United States.

18 U.S.C. §3553(a)(2) articulates the purposes of punishment to be considered when imposing sentence. The goal of "promot[ing] respect for the law," 18 U.S.C. § 3553(a)(2)(A), is not served by incarcerating defendants who did not, and could not, know their conduct in any way involved the laws of the United States of America. There is no evidence that Mr. Ellis or Mr. Palma intended to violate a law of the United States. Nothing about imprisoning these men will augment respect for American law. Additionally, the goal of "protect[ing] the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), will not be served by imprisoning two men who had no idea their conduct was in anyway affecting citizens of the United States.

Given the fact that Mr. Palma and Mr. Ellis have led law-abiding lives, there is no need "to protect the public from further crimes of the defendant[s.]" 18 U.S.C. § 3553(a)(2)(C). While imposing a lengthy term of imprisonment on Mr. Ellis and Mr. Palma may further the goals of "afford[ing] adequate deterrence to criminal conduct" 18 U.S.C. § 3553(a)(2)(B), since both Defendants have no criminal history whatsoever, this goal can be (and has been) met by their extradition from their native country, being hauled into a foreign criminal court, and their incarceration these past 9 months.

In addition to the goals of sentencing, Defendants' lack of contact with the United States, and lack of knowledge that their actions violated the laws of the United States is relevant to sentencing in that it dramatically colors "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and Mr. Ellis and Mr. Palma's culpability for violating United States law.

Neither Defendant contests this Court's jurisdiction, however relevant Second Circuit law examines the "reasonableness" of legislation that criminalizes extraterritorial conduct based on the extent to which the conduct has a foreseeable impact on the United States. The Second Circuit observed that Congress "may be constrained by a 'reasonableness' standard in enacting legislation that asserts jurisdiction over extraterritorial criminal conduct, stating that '[t]he reasonableness of an attempt to exercise extraterritorial control depends on such factors as the extent to which the conduct 'has substantial, direct, and foreseeable effect' in the legislating country, and the extent to which other states 'may have an interest in regulating the activity.'" United States v. Yousef, 327 F.3d 56, 109 (2d Cir. 2003), quoting, Restatement (Third) of the Foreign Relations Law of the United States § 403(2)(a), (g) (1987). See also United States v. Javino, 960 F.2d 1137, 1143 (2d Cir.1992)(same). While neither Mr. Ellis nor Mr. Palma challenge this Court's jurisdiction, the *logic* behind jurisdictional limitations reflect the linkage between foreseeable forums of punishment and the appropriate assessment of culpability. Mr. Ellis and Mr. Palma were, regrettably, part of a large trans-continental conspiracy. But, as the mice at the bottom of the food chain, they were unaware that by transporting a package from point A to point B in their native Canada, they would be hauled into a United States Courthouse. Their lack of contact with the United States is relevant to sentencing under 18 U.S.C. § 3553(a)(1), which requires this Court to consider "the nature and circumstances of the offense[.]"

**B. Guidelines Suggested Sentence Is Dramatically Inflated By Amount Of Money Defendants Transported—When It Comes To Sentencing Mules, The Amount Of Cash In A Shipment Is A Poor Indicator of Culpability.**

Under the Guidelines, Mr. Palma and Mr. Ellis' base offense level was increased by 16 levels because the value of the laundered funds was between $1,000,000 and $2,500,000, thereby dramatically inflating their sentence under the Guidelines. The factors enumerated in 18 U.S.C. § 3553(a) argue strongly for an out-of-guidelines sentence in light of the fact that there is little relationship between Mr. Ellis and Mr. Palma's role in the instant offense and the amount of funds they are accused of laundering. Courts, both pre- and post-Booker, have encountered similar situations and found that in money laundering cases, where the defendant is a mere mule or low-ranking handler, often the monetary tables in the Guidelines unjustly inflate sentences. See, e.g., United States v. Stuart, 21 F.3d 76, 83 (3d Cir. 1994)(the application of the Guidelines "monetary tables bear little or no relationship to the defendant's role in the offense and greatly magnifies the sentence").

Where money laundering defendants had no role in selecting the amount of money to be laundered and the amount was far in excess of their personal gain, district courts routinely issue out-of-guidelines sentences. See,e.g., United States v. Alexeev, 2008 WL 1969594, at * 3 (E.D.Wis. 2008)("The guidelines recommended 46-57 months in prison, but as discussed above, this range was significantly inflated by the amount of money [defendant] laundered, an amount defendant had no role in selecting and an amount far in excess of defendant's gain...").

In United States v. Restrepo, 936 F.2d 661 (2d Cir. 1991),[3] defendants pled guilty to laundering narcotics proceeds. Id. at 665. The defendants' roles were limited to loading boxes of money in a warehouse that turned out to be part of a massive drug conspiracy. Id. at 668.

---

[3] While Restrepo is a pre-Booker case, its reasoning is still relevant in considering an out-of-guidelines sentence pursuant to 18 U.S.C. § 3553(a).

Under the Guidelines, the base level of the offense was decreased by 4 levels for their minimal role in the offense and the base offense level was increased 9 levels for the stipulated amount of the funds involved. Id. at 665. The district court accepted these calculations, "which yielded an adjusted offense level of 29, and then departed downward four additional levels on the ground that the defendants' minimal involvement in the offense was not adequately accounted for in the Sentencing Guidelines." Id. In its decision, the district court articulated the reason for this and other departures as "recognition of the fact that the guidelines and calculations do not…adequately appreciate the factual complexities of this case, that is the different roles of the defendants in this multi-defendant case…the relative role of this defendant vis-à-vis others, the relative degree of acceptance of responsibility." Id. at 666 (emphasis added). The government appealed and the Second Circuit held that "where, as here, an offense level has been extraordinarily magnified by a circumstance that bears little relation to the defendant's role in the offense, a downward departure may be warranted on the ground that minimal participation exists to a degree not contemplated by the guidelines." Id. at 667.

While Defendants do not challenge the Guidelines calculation, the logic of Restrepo applies to a 18 U.S.C. § 3553(a)(1) assessment of Defendants' role in the offense. Mr. Ellis and Mr. Palma were mere mules in a scheme that was unforeseeably complex and criminal. Tying sentences for money laundering to the number of dollars allegedly laundered was based on a "contemplated…connection between the quantity of money implicated and the extent of a defendant's participation in the offense." Id. at 667. Here, however, where Mr. Ellis and Mr. Palma's sole function was to serve as carriers, "such a connection is lacking." Id. Defendants did not even know how much money they were transporting. The Royal Canadian Mounted Police Investigation Report notes that when an undercover agent asked Mr. Ellis "how much

money he had.  Ellis replied five hundred [thousand] all in hundreds."  Investigation Report,
Royal Canadian Mounted Police, dated Feb. 17, 2004, Exh. D at 1.  In fact, Mr. Ellis was not
transporting $500,000, he was transporting $792,000.  Id. at 2.  Defendants' lack of personal
knowledge or control as to the amount of money they were transporting renders the suggested
Guidelines sentence unjust as it punishes Mr. Ellis and Mr. Palma without individualized
reference to their particular roles.

In light of Mr. Ellis and Mr. Palma's low-level role in this large, complex money
laundering scheme, and in light of the "spiraling effect that the amount of cash had on these
defendants, particularly in light of its assumed link with their role in the enterprise," id. at 668,
this Court should sentence Defendants to an out-of-guidelines term of time served.  See 18
U.S.C. §3553(a)(1) (requiring consideration of the "nature and circumstances of the offense");
18 U.S.C. § 3553(a)(2)(A) (requiring consideration of the "seriousness of the offense").

### III. CONCLUSION

The purposes of sentencing would not be satisfied by sending these Canadian men to
prison for 33-41 months.  Until the instant offense, they lived their entire adult lives as law-
abiding citizens of Canada.  There is no need to use such a weighty hammer to deter these
family-men from engaging in further criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  They have
had no relevant contact with the United States.  There is no need to punish these men to ensure
they will respect American law.  18 U.S.C. § 3553(a)(2)(A).  Furthermore, both men face
potential civil liability in Canada upon their deportation.  See Exh.A (Ltr. from Revenu Quebec
to Juan Carlos Ellis, dated Mar. 31, 2008).  A 33-41 month sentence is "greater than necessary"

to "provide just punishment for the offense" and to "afford adequate deterrence to criminal conduct." 18 U.S.C. §3553(a)(2)(A), (B).

A Guidelines sentence would punish Mr. Ellis and Mr. Palma as if they were ringleaders of a major international drug laundering cartel. They were not. In fact, they were a janitor and a cook, with families whom they loved and were trying to support, who participated in something much larger than they could possibly imagine, and never did they imagine that their conduct constituted a violation of American law.

An out-of-guidelines sentence of time served, followed by immediate deportation to Canada, will "sufficient[ly]" reflect the seriousness of their offense and provide just punishment. 18 U.S.C. § 3553(a)(2)(A).

Dated:  New York, New York
        August 4, 2008

                                        Respectfully submitted,


                                        RONALD L. KUBY [RK-1879]
                                        DAVID PRESSMAN [DP-9136]

                                        Law Office of Ronald L. Kuby
                                        119 West 23rd Street, Suite 900
                                        New York, New York 10011
                                        (212) 529-0223 (t)
                                        (212) 529-0644 (f)

                                        Attorneys for Mr. Palma and Mr. Ellis

EXHIBIT A

**Revenu**
**Québec** ✚✚
          ✚✚

Direction générale du centre de perception fiscale
et des biens non réclamés

Le 31 mars 2008

JUAN-CARLOS ELLIS
1027, RUE JEAN-LESAGE
SAINTE-JULIE (QUEBEC)   J3E 2E8

Numéro de référence : 5929567

**Objet : Demande de paiement**

Monsieur,

Le 14 décembre 2007, un jugement, dont vous trouverez ci-joint une copie, a été prononcé en faveur du ministère du Revenu du Québec.

En vertu de ce jugement, vous devez nous remettre 756 913,98 $, y compris les droits, les pénalités, les frais et les intérêts courus au 31 mars 2008. Veuillez nous faire parvenir le paiement de la somme due d'ici le 15 avril 2008.

À défaut de donner suite à cette demande avant la date indiquée ci-dessus, vous serez passible de recours judiciaires sans autre délai ni avis.

Veuillez prendre note que des intérêts sont calculés sur la somme mentionnée ci-dessus, selon les modalités et le taux prévus par les lois fiscales, et ce, jusqu'au paiement complet de la dette.

Par ailleurs, si vous êtes en droit de recevoir une somme d'un organisme public, alors que vous êtes redevable d'un montant exigible en vertu d'une loi fiscale, le Ministère pourrait exiger de l'organisme, en vertu de l'article 31.1.1 de la Loi sur le ministère du Revenu, qu'il lui transmette tout ou partie de cette somme, jusqu'à concurrence du montant de votre dette fiscale, et l'affecter au paiement de celle-ci.

Nous vous prions d'agréer, Monsieur, l'expression de nos meilleurs sentiments.

Pierre Béland

p. j. Copie du jugement

3e étage, secteur R32CPF
1600, boulevard René-Lévesque Ouest
Montréal (Québec)  H3H 2V2
**Téléphone :** 514 415-5091, poste 5091
Sans frais : 1 866 418-3527 , poste 5091
Télécopieur : 514 285-3831
www.revenu.gouv.qc.ca

A-1

PER-6009 (2007-09)

MAI-26-2008 12:41   DE :FILTEAU BELLEAU AVOC 514-499-1889    A:1212529064    P.6

Afin que nous puissions traiter efficacement ce dossier, il est important que les documents que vous expédiez parviennent au bon destinataire.

Pour cette raison, vous voudrez bien :

• utiliser l'enveloppe-réponse ci-jointe pour l'envoi de vos documents ;

• y insérer la partie inférieure de cette page de façon à ce que l'adresse apparaisse dans la fenêtre de l'enveloppe.

Nous vous remercions de votre collaboration.

PER-6297 (2007-09)

✂ - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Revenu**
**Québec** ✚✚
✚✚

Direction générale du centre de perception fiscale
et des biens non réclamés

NUMÉRO DE RÉFÉRENCE : 5929567

NOM : JUAN-CARLOS ELLIS
1027, RUE JEAN-LESAGE
SAINTE-JULIE (QUEBEC)  J3E 2E8

RETOURNEZ À :

Pierre Béland
3e étage, secteur R32CPF
1600, boulevard René-Lévesque Ouest
Montréal (Québec) H3H 2V2

A-2

109

No : 505-05-009104-073

Cour Supérieure

Sous-ministre du Revenu du Québec

contre

Juan-Carlos ELLIS, dont l'adresse du
domicile et de la résidence est 475, rue
St-Charles O. appartement 100 à
Longueuil, J4H 3X1, district de Longueuil

Certificat prévu à l'article 13
de la *Loi sur le ministère du Revenu*

(L.R.Q., c.M-31)

A-3

MAI-26-2008 12:42    DE :FILTEAU BELLEAU AVOC 514-499-1889    A:12125290644    P.8

632403

CANADA                                          Cour Supérieure
Province de Québec
District de Longueuil

No :              505
                  05-009104-073

Le    2007 DEC. 1 4

## JUGEMENT

VU les dispositions de la Loi ;

VU la production du certificat requis tel qu'il figure au verso ;

POUR CES MOTIFS, la cour condamne

   Juan-Carlos ELLIS, dont l'adresse du domicile et de la résidence est 475, rue
   St-Charles O. appartement 100 à Longueuil, J4H 3X1, district de Longueuil

à payer au ministre du Revenu du Québec la somme de 735 618,54 $ et les intérêts
capitalisés quotidiennement à compter du 7 décembre 2007 au taux déterminé selon
les articles 28 et 28.1 de la *Loi sur le ministère du Revenu* (L.R.Q., c.M-31), sur le
montant de 735 618,54 $ ainsi que les dépens.

*Gilles Bussière Jr.*

A-4

PER-6655.2 (2006-11)

EXHIBIT B

To whom it may Concern

I am wrighting this Letter to describe Gerardo Palma

I am with my husband for 12 years and it is 6 years Close to 7 years we are Married. We have a Very happy marrige. He is a father of 2 childrens our Son of 5 years 1/2 he is gona to be 6 in September and our Daughter of 4 year old in may.

Gerardo is the younger of 6 kids he has 2 Sisters and 3 Brothers and his mother.

Gerardo is the favoureaite of all his family He is an uncle of 11 kids He has a Very big family that is Very United.

Gerardo is an extraordinary person, he is a Very affectinate person, funny, Sociable, friendly, Whelpful, and a hard worker, good Hearted, gentle Loving and Could add more ect...

Gerardo is a person that would not harm anyone, not even a fly.

He is a person that would give his Shirt off his bac to help Somone.

Gerardo does not Smoke, does not drink, does not take any drugs, does not have any bad habit's.

B-I

With me his wife he is the Best husband and father. He is romantic, Loyal, faithful and always there for me

Gerardo with his childrens, it is incredible how he is a good father, he Love's playing with them he would give them their bath, feed them and would put them to sleep with a bed time story.

He would wake up early to bring his Son to school. He Loves his kids more than life. He is a person that is not ashame to Say he loves you....

Gerardo drives 1½ hours to go to work every day at his brother restaurant "Poutine Lafleur" when he does not work at the restaurant, he work with his other Brother at the Camping. He also work independetly as a Representative at "ACN." "All Communication Network"

He works. when he is at the restaurant and up to 9:00 P.M when he is finish he come home to his family.

During the Summer Season we have the Responsibility of The Restaurant for the Camping. We work up to 16 hours a day and we take care of our children at the same time.

I am telling you personally that Gerardo Palma is an extraordinary and wonderful man. He is loved by his family and all his friends.

B–2

We all miss him and especially his children. He is a greate father.

Gerardo has no Previous files, no unpaid Tickets, No Violence, he pay's his Taxes. He is a good Canadian Citizen.

Hope with this letter you can see that Gerardo Palma is a good and kind-hearted person.
Thank you

Sincerely yours

His wife Nadia Sanducci

B-3

Montreal, May 4th 200?

To whom it may Concern,

My name is Diane Allard, Mother-in-law of Gerardo Palma. Gerardo has been part of the family for 12 years; he has been married to my daughter Nadia Landucci for 6 years. Gerardo is a very caring person with a very big heart, always willing to help. Gerardo is a very funny person, always playing jokes on his sister in-law Sonia and myself. He is a very loving person to his wife and 2 children. Gerardo loves to be surrounded by his family and friends. He works hard to make sure that his wife and children have everything they need. I love him very much for everything he does for everybody and respect him for the person he is. I miss him very much! Neo is a good person.

Sincerely Yours.

Diane Allard

B-4

Hello!

I'm Gerardo Palma's sister. My name is Sandra Palma. This is what my little brother is like. My brother is what I value the most. He's a model brother. He is very generous and nice to everyone who knows him. He is friendly to everyone he meets. He is hardworking, honest, sincere and especially (easy-going) and a good guy. I think my brother's the best one in the world. He's always in a good mood. Being with him is not boring. He is the sunshine of my life. My brother is a very good father; he has two small children; Enrique and Adriana who are very darling and a wife, Nadia. It's his own little family. He likes to take care of his whole family; my mother as well as his sister, brother, sister-in-law, brother-in-law and his little nephew. My brother is always smiling. We never have any fights with him. Everything is fine. My brother is my strength. My brother wouldn't hurt a fly. He likes to help those who are in need. He never says "no". He's the best brother. He's athletic. He likes to play golf. That's his favorite sport. He likes to kid around and play practical jokes. Everyone he meets become attached to him. That's my little brother. I love him a lot and miss him. I can't wait to see him. I miss him a lot. Thank you. Have a nice day.

Sandra Palma

B--5

Pour Gerardo Palma

Bonjour!

Je suis la seour de Gerardo Palma
mon nom est Sandra Palma.
Voici comme est mon petit Frère
mon Frère se le plus presieux pour
moi se un Frère exemplaire il est
Tres jenereur sempatique avec Toute le
monde qui le conese. il est emable
avec Toute le monde qu'il rencontre.
il est Travallieur, Honete, sincere et
sourtout (bonasse) bon gas. mon Frère
se le meilleur au monde pour moi.
il est Toujour de bonne Hoomor avec
lui on ça nuit pas, il est le soleil
du jour, mon Frère cet un Tres bon
Père de famille il à deux petit
emfant Enrique et adriana des
vrais amour et sa femme Nadia
ce sa petit famille a lui. il aime
prendre soin de Toute la famille
ma mère en si que ce seour Frere
belle seour beaux Frere est se petit
neurves. montre et Toujour sourriant,
on a jamais des conflis avec
lui Tout va bien mon Frère ce
ma Force a moi. mon Frere ne fait
pas mal a une mouche il aime
rendre service a si qu'on a besoin
il dit jamais non ce le meilleu
Frere, il est sportif il aime jouer
au golf cet son sport prefere.
il aime jouer des Tours, il aime
faire des blagues, Toute les persones

B-7

qoi il aprevoi sa Tache
a lui. Voici mon petit frère.
moi je l'aime beaucou et
je m'anuit de lui je Hâte
de le revoir il me manque
beaucou. merci a vous
Passe une belle journée

Sandra Palma

B-8

Mr. Manuel Leonardo Palma

I am Gerardo Palma's brother.  I have two children and my two children are asking me when their uncle is coming back because they miss him and cry. Sometimes, when Gerardo calls and the children are there, they say hello to him but then their sadness comes right back.  Their first question every day is if Uncle Gerardo is coming back soon.  He's a very nice and generous guy.  He is held in high esteem by everyone and is very well liked.  He has friends from everywhere. How can a father like he is be replaced?  My children try to change his children's minds by taking care of them but it's in vain because they become sad right away. Gerardo's children, his family and his friends really miss him.  We used to have a lot of fun playing darts every Friday evening.  While we were living in St. Hubert we used to volunteer in soccer for young kids.  We were in charge of training for two to three teams each season while we played on a senior soccer team.  In the wintertime, we used to play hockey at the park and then we'd play golf, Gerardo's great passion.

As for work, I often worked with my younger brother.  It all started with my father's print laminating company, Palma and Sons.  It was lots of fun.  We were only around 12 or 13 years old and liked to work together helping my parents.

That continued until we were 25 or 26 years old but we kept helping him while we worked at another job.  Afterwards we started working at Poutine Lafleur and Gerardo worked at Poutine Lafleur and at a campground in the summer until his incarceration.

     Leonardo Palma

Manuel Leonardo Palma

Je suis le frère de Gerardo Palma
j'ai 2 enfants et mes 2 enfants me demande
quand son oncle va revenir parce qu'il
s'ennuis et ils pleurent. Parfois lors de
l'appel de Gerardo les enfants son là
et loi disent allo mais leur peine
revient aussi vite tout les jours
leur première question es est ce
qu'il reviens bientôt mon oncle
Gerardo. Sais un garçon très gentil
et très généreux tout le monde
l'apprécie et il est très aimé il
se fait des amis de partout.
Comment remplacer un père comme lui
mes enfants essaye de change
les idée à ses enfants en s'occupant
d'eux mais en vain leur tristesse
reviens au galop. Gerardo manque
tellement à ses enfants, sa
famille, et ses amis.
Tout les vendredi soir on jouais au
Dart on se faisais beaucoup de
plaisir. lorsqu'on n'habitais a
St Hubert on n'etais benevole au
soccer pour les jeune enfants
on s'occupait d'entrainer 2 a 3
equipes par saison par le fait
même on jouait pour une equipe
de senior on jouais l'hiver dans
le parc au hockey, et puis par
la suite venue le golf la grande
passion de Gerardo

Pour ce qui est du travail j'ai
souvent travaillé avec mon
vieux frère. Tout a commencé
avec la compagnie de mon père
les laminages de l'arbre
de ma et fils en j'avais beaucoup
de plaisir en j'avais à peut
près 12 à 13 ans on a toujours
travaillé ensemble a aidé mes
parents. Ça c'est poursuivi
jusqu'à l'âge de 25 à 26 ans
mais continuais à l'aider
pareil mais en allant travailler
a un autre emploi.
par la suite on m'est allé
travailler chez mon frère lafleur
et aussi que Gérard. Sois
incarcéré Gérard travaillais
chez poutine lafleur et au
Camplus Pété.

Leonardo Palmer

Gerardo

For me and my brother, our uncle Gerardo is like a second father.  When he left

we felt sad and unhappy and didn't want him to go.  Whenever we'd see him he

would play with us.  On my saint's day, I, Carolane Palma told my mother on that

same morning that the best present in the world would be for him to call me and

tell me happy saint's day.  This person is very important in our lives.  Gerardo is

my little brother's godfather.  He's six (and I'm ten).  Me and my brother go to a

campground but it feels different now that we don't see him anymore but we used

to see him every weekend.  I cry a lot because I miss him.  Carolane and Mickael

Palma

Gérard

Pour moi et ... et ... notre oncle Gérards est ... ...
deuxième père. Quand il est parti, on se sentait ... ...,
c'était et on ne voulaient qu'il parte. Il jouait toutes les heures ...
... avec nous. À ma tête moi Carolane ... ... ...
j'ai dit à ma mère que le plus gros cadeaux au monde c'est
qu'il m'apelle pour me dire bonne fête . ... et ... ... ...
dans notre vie. Gérards c'est le parrain à mon petit frère qui a 6 ans
(et moi 10 ans). Moi et mon frère on va a un camping et sa fait
différent de ne plus le voir mais avant on le voyait tous les jours
de la fin de semaine. Je pleure souvent parce que je m'ennuie de
lui. Carolane et michaël Palma

May 10, 2008

My name is Stephanie Leblanc. I have been married to Leonardo Palma, Gerardo Palma's brother, for nine years. I have known Gerardo for 14 years. For me, Gerardo is a big brother, a big teddy bear. You can trust him and tell him everything, he'll never betray you. Gerardo is the light of our lives which have become very gloomy since he left. He always has the right words to comfort us or make us laugh. His life is his family (his wife, children, mother, brothers, sisters, brother-in-law, sister-in-law, nieces, nephews and friends).

As for me, I have two children, Carolane who is ten and Mickael who is six and Gerardo's godson. There is sadness in their eyes now that Gerardo is not there. It's a daily struggle to relieve their suffering but he is not replaceable.

I work at the Poutine Lafleur restaurant and God only knows that it's not always a barrel of fun to work with one's brother-in-law but with him it was always so easy and so fun. We always had fun and the customers used to say that it was like going to a show and the customers liked it because we always used to kid around. All the customers ask me when he's coming back. It's not the same ambiance as it used to be.

B-15

Everything revolves around his family, his job, his hobbies, and his sports. What's better than a good round of golf between brothers or a game of soccer between parent and kids?  This is all to tell you that Gerardo Palma is an extraordinary man and really wonderful to everyone.

Stéphanie Leblanc

10 mai 2008

Je m'appel Stéphanie Leblanc Je suis mariée Depuis 9 ans avec Léonardo Palma Le frère Gérardo Palma Je connais Gérardo depuis 14 ans. Pour me Gérardo Sais un grand Frère un gros nounours tu peut tout lui raconter et lui faire confiance il ne te trahira jamais. Gérardo est Comme un soleil dans nous vie et depuis qu'il es partis elle fait très sombre. Il a toujours Les mots pour réconforter ou pour faire rire. Sa vie C'est sa Famille (sa femme, ses enfants, sa Mère Ses Frères, ses soeurs, beau frère, ses belle soeur, Ses nièces, ses neveux et ses amis)

Moi J'ai deux enfants Carolane de 10 ans et Mickaël 6 ans dons le parrain est Gérardo. Ha quel tristesse dans leur yeux de voir que Gérardo n'est pas la. Un combat de tout Les jours de soulagé leur peine mais il n'est pas remplaçable.

J'ai travail au restaurant Poutine la fleur et dieu seul sais que se n'est pas toujours rose de travaillé avec son beau frère Mais lui m'étais toujours ça tellement facile et tellement drôle. On avait toujours du fun et Les clients disaient que c'était Comme allé voir un show et les clients aimaient ça car on faisait toujours des farces, tout les clients me demande quand vas t-il revenir l'ambiance n'est plus la même qu'avant.

Toute tourne autour de sa famille son travail
Ses loisirs, ses sports. Quoi de mieux
Qu'une bonne partis de Golf entre frère
Ou d'une partis de soccer entre parent
et enfants! tout ça pour vous dire que
Gérardo Palma est un homme extraordinaire
et vraiment formidable avec tout le monde

Stéphanie Leblanc

6/16/08

Gerardo is a man who is loved by everyone. Everyone who knows him loves him for his kindness because he's polite to people, he listens to others and is respectful towards them. At times he is also a little shy and reserved. Gerardo likes to help and is there when I need him. He's a very generous person by nature.

He also likes to laugh and kid around and play jokes on his friends or on his brothers and sisters. That's also because he's the youngest brother. Gerardo has great love for his family, his mother, sisters, and brother. He has great love for his children and his wife.

All his nieces and nephews love their uncle. His nephews adore him because he devotes lots of time to playing with them and he loves them almost as much as his own children.

As for sports, he likes soccer and especially golf.

What could make Gerardo unhappy is to be far from his children since they are his greatest pride and joy.

B-19

As for me, Graciela Palma, Gerardo Palma's sister, I'm happy to have a brother like him and I love him a lot.

Graciela Palma

Gerardo est un homme qui est aimé de tous.
Toute personne qui le connaissent l'aime pour
sa gentillesse, parce qu'il est poli avec les gens,
il est à l'écoute des autres et est respectueux envers eux,
il est aussi un peu timide et réservé des fois.
Gerardo aime aider et si j'ai besoin de lui, il
va être là, c'est une personne très généreuse de sa
personne.
Il aime aussi rire et il aime beaucoup faire des
blagues ou des tours à ses amis ou ses frères et sœurs,
c'est aussi à cause qu'il est le plus jeune des frères.
Gerardo aime énormément sa famille mère, sœurs
et frère, il aime énormément ses enfants et sa femme.

Il est un oncle aimé de tout ses nièces et neuveux.
ses neveux l'adore car il leur consacre
beaucoup de temps pour jouer avec eux et lui
il les aime presqu'autant que ses
enfants.
les sport qu'il aime sont le soccer et surtout le golf.

Ce qui peut rendre Gerardo malheureux c'est
d'être loin de ses enfants car pour lui c'est
son plus grand bonheur et plus grande fierté.

moi GRACIELA PALMA sœur de Gerardo Palma
suis heureuse d'avoir un frère comme lui
et je l'aime beaucoup.

R-21

6/11/08

I am Gerardo's mother and am writing this letter to say how affectionate and kind my son is. He's always happy when he's with his siblings and friends. He is married and has two small children, a four year-old girl and a good six year-old boy. He works hard and doesn't make trouble for anyone. He's affectionate and a good husband. I love him a lot and miss him so much. He's the youngest brother. I love him a lot. He's an excellent son.

The mom xxxx
[drawing of heart]

611-6-08

Yo soy la Madre de Gerardo y escribo estas linea
para decir como es mi hijo carinoso amable
siempre esta contento con los hemanos amigo
El es casado tiene 2 hijito una nena de 4 y
otro 6 año bien hijo trabajador, no face problema
con nadie carinoso buen marido yo lo quiero mucho
y lo estraño tanto el es hermano mas chico
y yo lo quiero mucho es un hijo eselente

La mamá  XXX X

B-23

EXHIBIT C

I would like to talk about my dad,

he is borned on dec. 8 1961 in chili, he is a twin. His parents decided to come to live in Canada in 1976 to give a better future to their sons. He was 15, he had to learn French, find new friends go back to a new school. At 16 he found a job to help family. Together within few years Canada becomes their country. As for my dad is a deeply good father good person, good husband. He always be there for me day and night to take care of me, talk to me, listen to me, teach me good things. He is a man that can give his shirt to somebody in need, always ready to help. I know that family is the most important part in is life. When he was 16 his twin got a cancer, he supported him. After, his mom got also cancer, he took care of his mom as much as he could. Today his parents are passed over, he miss them. My dad fall in love withe my mom when he was 21. Four years later they got married and few years later I was born. My parents was so proud. I am proud of my father, because he teached me that life is not always easy, that we have to love, to support, to help, to forgive, to share.

Actually, he's the best dad. I couldn't have!

Paulina Ellis



2008/06/20

Ladies and Gentlemen;

I wish to speak to you about my brother, my friend, Juan Carlos Ellis.

Carlos is more than a brother to me...... We are twins. As they say, and it is true, the connection between twins is very strong. In difficult times, I can always count on him. I had cancer a few years ago, and it's the encouragement and support from my brother that got me through it. Also, after our mother passed away, which was a very difficult time for us, our bond only got stronger. Afterwards, our father passed away. Thus, not having any other brothers or sisters, we are the only 2 that remain.

Taking care of his family is what was important to Carlos. He is someone that is very hard working, positive and has a love for life. He is has proven to be generous with his surroundings and mostly available at all times.

Carlos is fundamentally a good person and an excellent brother.........he is my family.

Patricio Ellis

2008/06/20

Mesdames, Messieurs;

Je vais vous parler de mon frère, mon ami, Juan Carlos Ellis.

Carlos est plus qu'un frère pour moi. Nous sommes jumeaux, et souvent, et c'est le cas, la connexion est plus forte entre jumeaux. Dans les moments difficiles, je peux toujours compter sur lui. J'ai eu le cancer, il y a quelques années, et heureusement j'ai eu beaucoup de support et d'encouragement de la part de mon frère. Aussi, lors du décès de notre mère (qui fut très difficile) nos liens se sont tissés serrés. Par la suite, il y a eu le décès de notre père. Nous sommes donc les deux seules de la famille qui restent puisque nous n'avons pas d'autres frères ni sœur.

Carlos a toujours prit soins de sa famille, c'est important pour lui. Aussi, c'est quelqu'un de travaillant, de positif, qui aime la vie. Il est généreux avec ses proches et disponibles en tout temps.

Carlos est fondamentalement une bonne personne, un excellent frère. Il est ma famille.

Patricio Ellis

C-2

March 20, 2008

To whom it may concern,

I've know Mr. Juan Carlos Ellis since February 1987. ( 21 years ago).  When I was hired by my present employer, Mr. Ellis was already an employee.

I got to know him through the years and he's a co-worker that's proven to be: hardworking,  reliable, trustworthy and dedicated.  Thus, someone you can always count on.

He's a person with a firm character but always pleasant.  This is Juan Carlos Ellis as I know him.

Ginette Lortie
29 rue Lefrançois
Repentigny, QC
J6A 4Z9

March 25th, 2008

Ladies and Gentlemen;

I have known Mr. Juan Carlos Ellis since 1989, basically since I was hired at my present employer ABM International, where Mr. Ellis was also employee.

Through the years, I have worked closely to Mr. Ellis. He is someone that has proven to be hardworking, responsible and proud of his accomplishments.

He is a sociable and interesting person to talk to. Most of all someone who can be reliable to all his co-workers.

Le 25 mars 2008

Mesdames,
Messieurs,

Je connais Monsieur Juan Carlos Ellis depuis 1989, soit depuis mon embauche chez mon employeur chez qui M. Ellis était aussi employé.

Au fil des années, j'ai travaillé étroitement avec M. Ellis.   C'est quelqu'un de très travaillant, responsable et fière du travail accompli.

C'est une personne sociable et agréable à discuter, sur qui tous ses collègues de travail peuvent compter.

Chantal Bernier
Collègue de travail depuis plus de 18 ans.

C-4

EXHIBIT D

| INVESTIGATION REPORT | RAPPORT D'ENQUÊTE | Protected B |
|---|---|---|
| | | SECURITY CLASSIFICATION / DESIGNATION<br>CLASSIFICATION/DÉSIGNATION SÉCURITAIRE |

| OTHER FILE REFERENCES<br>AUTRES CONSULTATIONS DE FICHIERS | DIVISION<br>C | DATE<br>2004-02-17 | RCMP FILE REFERENCES<br>CONSULTATION DE FICHIERS DE LA G.R.C.<br>2002-UMPC-1897 |
|---|---|---|---|
| | SUB-DIVISION - SOUS-DIVISION | | 2003-UMPC-5081 |
| | DETACHMENT - DÉTACHEMENT<br>IPOC Montréal | | |

| RE - OBJET |
|---|
| Project Capello |

## 2004-02-12  MONEY PICK-UP

On the 21st day of January, 2004, Special Agent Brian DeJoy, of the DEA office in New York, contacted the Montreal Integrated Proceeds of Crime.  S/A Dejoy gave the investigators in charge of project Capello the phone number, 514-794-4945, to be use to reach "Carlos" concerning the next money pick-up scheduled for February. Following this information we prepared an affidavit for a Digit Number Recorder, for which a warrant was granted.  This warrant is use to find phone numbers of in coming and out going calls.   This warrant is also use to locate the cellular phone, by giving us the location of the cellular tower used by the caller at certain time.

In the morning of the 12th day of February, 2004, a surveillance team was on our main target, **Juan Carlos ELLIS**, DOB 1961-12-08. **ELLIS** was identified, through previous money pickups, as the person responsible for the delivery of the money to our under cover member.   At the residence of Juan Carlos ELLIS, a second individual was observed and identified as **Gerardo PALMA,** DOB1971-07-02. Both subjects left the residence in different vehicles and were later located at a car rental company where **Juan Carlos ELLIS** rented a van.   At that location, **ELLIS** took a heavy black bag from his vehicle and put it in the rented van.

At approximately 09:50 hrs, our undercover member (U/C) contacted the number given by the DEA and requested the male Spanish speaking person to go a Shopping Mall located on the North side of Montreal.  The U/C further requested the person to give him a call when he got there.  At 10:25 hrs, **Juan Carlos ELLIS** was seen in the parking lot of the mall.   Few minutes later **Gerardo PALMA** was also spotted at the same location.

At 10:56 hrs, our U/C was contacted by the same Spanish speaking person.  The under cover member requested the man to meet him behind a hotel near the mall.

At 11:05 hrs, **Juan Carlos ELLIS** parked his van by our U/C's vehicle.  He then got out and put the black bag in the trunk of our U/C's car.  To prove the knowledge of **ELLIS** transporting a large sum of money, we prepared a scenario with questions to be asked by our U/C.  The U/C told **ELLIS** that last time the money was stuck together and it was very difficult to count it.  **ELLIS** replied that it was not at his level but he would talk to his people.   The U/C replied by asking if they are satisfied with his services.  **ELLIS** answered positively to this question.   Finally, just before the departure of **ELLIS**, the U/C asked how much money he had.  **ELLIS** replied five hundred all in hundreds.

| INVESTIGATION  .PORT<br>- Continuation - | RAPPORT D'ENQUÊTE<br>- Suite - | Protected B |
|---|---|---|
| | | SECURITY CLASSIFICATION / DESIGNATION<br>CLASSIFICATION/DÉSIGNATION SÉCURITAIRE |

RE - OBJET
Assistance D.E.A. New york
Opération d'infiltration majeure
Projet Capello

On February 17th, 2004, we received from the DEA New York the conversations, related to the money pick-up of September 2003, between the DEA Under Cover Agent and "Carlos". Our U/C confirmed that the voice of "Carlos" was the same as the person he talked twice on the phone, in the morning of the money pickup dated the February 12th, 2004.   After listening these conversations another RCMP member identified the voice of "Carlos" to be the one of Gerardo PALMA.

With this money pick-up we positively  identified "Carlos" as Gerardo PALMA and show Juan Carlos ELLIS' knowledge that he was transporting a large sum of money in the black bag.

After counting the money, it was determined that there was $792 000.00us.  The money was deposited into a U/C RCMP account and then transferred, on the 19th day of February, 2004, into a U/C DEA account in New York.

Eric Larose, Cpl.
Montreal IPOC Section
Section UMPC Montréal


Marcel Paris, acting Staff Sgt.
Section UMPC Montréal


Luc Vaillancourt, acting Officer in Charge
UMPC Montréal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA,        )

               Plaintiff,       )

   -against-            )      S2 04 Cr. 045 (HB)

JUAN CARLOS ELLIS; and,     )
GERARDO PALMA
                        )
           Defendants.
-------------------------------------------------------------x

## AFFIRMATION OF SERVICE

DAVID PRESSMAN, an attorney duly admitted to practice before the courts of the

State of New York, and a member of the bar of this Court, hereby affirms under the pains

and penalties of perjury that on August 4, 2008, he caused to be served two true copies of

the Presentence Memorandum of Juan Carlos Ellis and Gerardo Palma in the above-

captioned matter upon AUSA Boyd M. Johnson, U.S. Attorney's Office, SDNY, One St.

Andrew's Plaza, New York, NY 10007 by hand and by ECF filing.

Dated: New York, New York
      August 4, 2008

                                           DAVID PRESSMAN [DP-9136]